Jacques ABADIE III, Chief Procurement Officer, and IIU Consulting Institute, Inc., Appellants,

v.

DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD and Trifax Corporation, Inc., Appellees.

Nos. 03–CV–1096, 03–CV–1134.

District of Columbia Court of Appeals.

Argued April 12, 2005.

Decided Feb. 8, 2007.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellant Jacques Abadie III.

Kenneth D. Brody was on the brief for appellant IIU Consulting Institute, Inc.

Barbara E. Brown for appellee Trifax Corporation, Inc.

Before REID and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.*

* Judge Schwelb was an Associate Judge of the Court at the time this case was argued. His status changed to that of Senior Judge on June 23, 2006.

GLICKMAN, Associate Judge:

Appellant IIU Consulting Institute, Inc. ("IIU"), and appellee Trifax Corporation, Inc. ("Trifax"), were competing bidders for a District of Columbia government contract. After the contract was awarded to IIU, Trifax filed a protest with the Contract Appeals Board. Several weeks later, Trifax amended its protest to raise additional grounds for overturning the award. The Contract Appeals Board sustained the protest on one of the added grounds, rejecting the argument that it was untimely, and the Superior Court upheld the Board.

Bid protests are subject to strict statutory time limitations, and the Board is without jurisdiction to consider a protest that is untimely. Trifax was required to raise the protest ground on which it prevailed no later than ten business days after it knew or should have known of that ground. We conclude that Trifax waited too long. Accordingly, we reverse.

### I.

On April 4, 2000, the District of Columbia Office of Contracting and Procurement ("OCP") issued an invitation for bids ("IFB") on a contract to provide the Department of Health with the services of two registered pediatric nurses. The nurses were wanted to conduct home visits with children enrolled in the Birth to Eight Project of the Preventive Health Services Administration for one base year and, at the government's option, up to four additional years. The IFB specified that the contract would be a "firm fixed price indefinite quantity contract with a fixed unit price," meaning that each nurse could be called upon to work anywhere between ten and 1,386 hours a year, with payment to the contractor based on a fixed hourly rate. The contract was to be awarded to "the lowest responsive responsible bidder." In the parlance of government contracting, a "responsive" bidder is one whose bid

"conforms to the material elements of an invitation to bid"; a "responsible" bidder is one who "has the necessary resources and experience to perform a given job." *American Combustion, Inc. v. Minority Bus. Opportunity Comm'n*, 441 A.2d 660, 671 (D.C.1982) (citations and internal quotation marks omitted). If a bid is not responsive, it cannot be cured after the bid is open and must be rejected. *Id.* "A lack of bidder responsibility is curable after the bids are opened," however. *Id.*

In addition to other requested information, the IFB required each bidder to submit the names and resumes of the "key personnel" (*i.e.*, the nurses) who would perform the proposed contract. Because "the personnel specified in the contract are considered to be essential to the work being performed hereunder," the IFB explained, the contractor would have to give advance notice and justify any change in personnel.

The OCP received eight bids in response to the IFB, including submissions from IIU and Trifax. The bids were opened for public inspection on May 12, 2000. IIU's bid quoted a total price of $367,549, with a base year price of $74,566.80 (all figures based on 1,386 hours of work by each nurse). This was the second lowest bid, and it was approximately twenty-five percent less than Trifax's bid of $479,247. IIU's bid did not include the names or resumes of the nurses who would perform the contract. The OCP specifically noted the lack of resumes in IIU's submission on the Bid Abstract Form, a summary of the information in all the bids that was prepared at the time of the bid opening. Nonetheless, on June 29, 2000, after eliminating the lowest bidder as non-responsible, the OCP awarded the contract to IIU. The base year price was fixed at $66,520, a reduced figure that reflected the contracting officer's unilateral decision to lower the

maximum annual number of hours that could be required under the contract from 1,386 to 1,236 hours per nurse.

As an unsuccessful bidder, Trifax received formal notification of the award to IIU on August 15, 2000. The notification stated that the solicitation was awarded to IIU in the amount of $66,520 without explaining the discrepancy between that figure and the higher base year price quoted in IIU's bid. After attending a debriefing session with the contracting officer on August 22, Trifax filed a *pro se* bid protest with the Contract Appeals Board ("CAB") on August 30, 2000. The protest challenged the award to IIU on several grounds, the principal one being that IIU was not a responsible bidder because it had not committed to pay the minimum wages and benefits required by a U.S. Department of Labor Wage schedule incorporated in the IFB and the contract.[1] This claim was premised on Trifax's mistaken assumption that the approved base year price of $66,520 was for two nurses working the original maximum annual number of hours specified in the IFB. Even after being debriefed on August 22, Trifax was unaware that the base year price was low because the maximum number of hours had been reduced.[2]

Trifax's August 30 protest did not raise the failure of IIU's bid to identify and provide the resumes of the key personnel who were to perform the contract. Nor did the protest expressly charge that IIU's bid was not responsive to the IFB.

On September 20, 2000, the District filed with the CAB an OCP report on the contract award together with a motion to dismiss Trifax's protest. This filing disclosed (apparently for the first time) that the contract award was based on a lower annual maximum number of hours than the maximum set forth in the IFB (thereby demonstrating that Trifax's minimum wage claim was in error). The District also contended that Trifax's protest was untimely under the applicable statute, which in pertinent part provided that "protests shall be filed not later than 10 business days after the basis of protest is known or should have been known, whichever is earlier." (Former) D.C.Code § 1–1189.8(b)(2) (1999), recodified as D.C.Code § 2–309.08(b)(2) (2001). Alternatively, the District asserted that Trifax was not aggrieved by the award and lacked standing to protest it because another bidder, Motir Services, Inc. ("Motir"), would have been next in line for the contract had IIU's bid been rejected. On October 5, 2000, however, the District acknowledged in a letter to the CAB that Motir had failed to submit bid prices for the third and fourth option years of the contract,[3] and for that reason

---

1. Trifax phrased this objection as follows:
   Trifax Corporation protests the contract award by The District of Columbia Government Office of Contracts and Procurement of IFB HCOC 157329 to IIU Consulting Institute, Inc. as irresponsible because of failure to provide for statutory direct wage, health & welfare, holiday and vacation compensation requirements of the U.S. Department of Labor Wage Determination No. 94–2103 (REV 19) Dated 6/28/1999 as incorporated into solicitation # IFB HCOC 157329. We further contend that other statutory cost [sic] such as FICA, FUTA, SUTA, Workmen's compensation must be properly included in a responsible bid.
   In its ultimate decision on the protest, the CAB found that while this protest ground was

"not artfully drafted," it "reasonably convey[ed] that, based on the award price, the bid cannot be intended to commit the contractor to meeting the minimum employment standards expressed in the IFB."

2. The other protest grounds that Trifax asserted on August 30 focused on alleged procedural irregularities on the part of the OCP and the contracting officer. None of these other grounds has any bearing on the present appeals, so we shall not discuss them further.

3. The OCP noted this defect in Motir's bid in the Bid Abstract Form it prepared on May 12, 2000, along with the fact that Motir, like IIU, had not submitted any nurse resumes with its bid.

the District thereafter conceded that Motir's bid was non-responsive.

At an October 13, 2000, status conference, the CAB asked about IIU's failure to submit the names and resumes of nurses with its bid. The following week, on October 20, 2000, Trifax amended its protest to assert, for the first time, that IIU's bid was not responsive because, *inter alia,* it omitted the key personnel information required by the IFB. Trifax stated that it had not been aware of the material omissions in IIU's bid until it reviewed the government's September 20 motion to dismiss and October 5 letter to the CAB. The District disputed the timeliness of Trifax's new objections to the award.

On January 8, 2001, the CAB issued its decision sustaining Trifax's protest on the sole ground that IIU's bid was not responsive to the IFB because it did not include the names and resumes of the key personnel who would perform the contract.[4] Although the CAB did not directly address the timeliness of Trifax's belated assertion of this ground on October 20, it said that it considered the issue because it was "immediately apparent in the record":

> Protest claims must be read broadly.... Maintenance of the integrity of the procurement system requires that, when any issue of responsibility or responsiveness have [sic] been raised in a protest, particularly in a protest filed *pro se,* the Board consider all issues relating to responsiveness which are *immediately apparent in the record,* regardless of whether or not the protester has explicitly raised the specific aspect of responsiveness.

*Protest of Trifax Corp.,* CAB No. P–624, 49 D.C.Reg. 3299, 3304–05 (Jan. 8, 2001) (emphasis in the original).

The District and IIU moved for reconsideration, arguing *inter alia* that the key personnel claim should have been rejected because it was raised too late. On March 20, 2001, the CAB reaffirmed its decision. The CAB held that the key personnel claim was timely because it was "reasonably included within" Trifax's claim that IIU did not commit to pay minimum wages. The CAB explained that the minimum wage claim

> is reasonably read as including the possibility that IIU will either not pay the minimum wage determined for a qualified pediatric nurse, *i.e.* the registered nurse, specialist rate, or that it will not provide a specialist and pay a lower minimum wage rate permitted for a nonspecialist nurse. In either event, the Board must look to the bid to determine if the bidder committed itself to both provide employees meeting the contract's minimum qualifications and pay the minimum wages determined by the Department of Labor for such employees.

\* \* \*

Since the employment of the identified employees is a mandatory term of the contract, the issue of their designation by IIU was reasonably included within the protest claim.

*Protest of Trifax Corp.,* CAB No. P–624, 49 D.C.Reg. 3346, 3350–3351 (Mar. 20, 2001). Although Trifax presented the minimum wage claim on August 30, 2000, which was more than ten business days

---

4. The CAB rejected Trifax's other grounds of protest, including its claim that IIU did not propose to pay the minimum required wages and benefits. The CAB found that the OCP report "showed that IIU was, in fact, committed to pay the required minimum wages" taking into consideration that the contracting officer had lowered the maximum number of hours that IIU's nurses could be required to work under the contract.

after it received formal notification of the contract award on August 15, the CAB considered that claim timely because the notification did not explain the discrepancy between the base year price in IIU's bid and the lower price at which the contract was awarded. As of August 15, the CAB reasoned, Trifax therefore still lacked "sufficient accurate information to frame" its minimum wage claim. *Id.* at 3350. Trifax had no opportunity to clear up the confusion until the debriefing that occurred on August 22, 2000, the CAB held, so its assertion of the claim on August 30 was timely.

The District (in the name of appellant Jacques Abadie, the Chief Procurement Officer of the OCP) filed a petition for review of the CAB decision in Superior Court, and both IIU and Trifax intervened. The court affirmed the CAB's decision.

The court agreed with the CAB that the ten-day period for filing Trifax's minimum wage claim did not begin to run until August 22, 2000, when the OCP debriefed Trifax. Accordingly, the presentation of that claim on August 30, 2000, was timely. The court acknowledged that Trifax did not raise its key personnel claim until October 20, 2000. But because IIU's failure to identify specific nurses arguably "provide[d] additional support" for Trifax's earlier, timely-raised minimum wage claim, the court concluded that it was "not clearly

erroneous" for the CAB to consider the belatedly presented key personnel claim.[5]

The instant appeals followed.[6]

## II.

Appellants present two issues for our consideration. First, did the CAB exceed its jurisdiction in considering Trifax's key personnel objection instead of rejecting it as untimely? Second, if the key personnel objection was timely, did the CAB err in holding that IIU's bid was not responsive to the IFB? We do not reach the second issue, because we conclude that the key personnel objection was, indeed, time-barred.

### A. Standard of Review

■■■ Review of bid protest decisions by the CAB must be sought, in the first instance, in Superior Court rather than this Court, inasmuch as protest proceedings are not contested cases within the meaning of the District of Columbia Administrative Procedure Act. *See Jones & Artis Constr. Co. v. District of Columbia Contract Appeals Bd.*, 549 A.2d 315, 318 (D.C.1988). However, we review the Superior Court's affirmance of the CAB's decision "in the same manner as if the ruling came to us directly from the agency." *Pitt v. District of Columbia Dep't of Corr.*, 819 A.2d 955, 958 (D.C.2003) (citation omitted). In other words, "it is the decision of the CAB that this court re-

---

**5.** In opposing the petition for review, Trifax asserted that its objections were timely because it did not become an aggrieved party with standing to protest the contract award until October 5, 2000, when the District first conceded that Motir's higher-ranked bid was defective. Stating that its role was limited to reviewing the decision of the CAB, the court did not reach Trifax's contention.

**6.** It should be noted that neither Trifax nor the CAB has submitted a brief on appeal.

Trifax elected to rely on the existing record, while the CAB failed without explanation to comply with the filing deadline after an extension was granted. Trifax's counsel appeared at oral argument and was permitted to address the Court. The CAB was not represented at oral argument. Thus, we decide the instant appeals on the basis of the record on appeal, appellants' briefs, and the oral argument.

views," and our review is *de novo*. *Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd.*, 893 A.2d 569, 572 n. 1 (D.C.2006). The statute governing bid protests provides that "[a] determination of an issue of fact by the Board ... shall be final and conclusive unless arbitrary, capricious, fraudulent, or clearly erroneous." D.C.Code § 2–309.08(e) (2001). "On questions of law, although the Board's decision is not final or conclusive, we give careful consideration to [its] interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." *Abadie v. Organization for Envtl. Growth, Inc.*, 806 A.2d 1225, 1227 (D.C.2002) (internal quotation marks and citations omitted). Because "District contracting practice parallels federal government contract law," we also look to the relevant decisions of federal tribunals with "particular expertise in this area." *Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346, 1351 (D.C.1993).

### B. Statutory Time Requirements for Bid Protests

■ The CAB is "the exclusive hearing tribunal" for protests of District of Columbia government contract solicitations and awards "by any actual or prospective bidder or offeror, or a contractor who is aggrieved in connection with the solicitation or award...." D.C.Code § 2–309.03(a) (2001); *see also District of Columbia v. Group Ins. Admin.*, 633 A.2d 2, 15 (D.C. 1993) ("[W]e do not question the CAB's role as 'exclusive hearing tribunal' for all bid protests."). By law, such protests are subject to strict time limits. Bid protests based on "alleged improprieties in a solici-

tation which are apparent prior to bid opening or the time set for receipt of initial proposals" must be filed before those respective events occur. D.C.Code § 2–309.08(b)(1). All other bid protests "shall be filed not later than 10 business days after the basis of protest is known or should have been known, whichever is earlier." *Id.* § 2–309.08(b)(2). "[A]lleged improprieties must be quickly asserted and expeditiously resolved so that the contract can be awarded and the job begun." *Jones & Artis Constr. Co.*, 549 A.2d at 319.[7] The CAB has construed the statute to mean that it is "without jurisdiction to decide matters that are filed beyond the 10–day period." *Protest of Rodgers Bros. Custodial Servs., Inc.*, CAB No. P–565, 46 D.C.Reg. 8564, 8566 (Feb. 17, 1999). We agree that the filing deadline is jurisdictional and not subject to waiver.

■ The statutory ten-day rule applies to each independent protest ground. "[T]he bid protest regulations do not contemplate the piecemeal presentation of arguments or information relating to a protest, and it is incumbent on the protestor raising one basis of protest to diligently pursue information pertinent to the protest as well as information that reasonably would be expected to reveal additional bases for the protest." *Protest of Koba Assocs., Inc.*, CAB No. P–265, 40 D.C.Reg. 4440, 4453 (Jul. 6, 1992) (citation omitted). Following the Comptroller General's interpretation of the federal counterpart to D.C.Code § 2–309.08(b)(2), the CAB has stated that "[g]enerally,"

> the timeliness of ... additional bases of protest raised after the filing of a timely

---

7. As stated in an opinion of the Comptroller General,

> Bid protests are serious matters which require effective and equitable procedural standards assuring a fair opportunity to have objections considered consistent with the goal of not unduly disrupting the pro-

> curement process.... Accordingly, our Bid Protest Regulations ... contain strict timeliness requirements for filing protests.

*Matter of Thomas May Constr. Co.*, 94–1 Comp. Gen. Proc. Dec. P210 (March 23, 1994), 1994 U.S. Comp. Gen. LEXIS 254, at *2 (U.S.Comp.Gen.1994) (citation omitted).

initial protest depends upon the relationship that the later-raised bases bear to the initial protest. . . . Where the later bases present new and independent grounds for protest, they must independently satisfy our timeliness requirements. Conversely, where the later contentions merely provide additional support for an earlier timely raised objection, we consider these additional arguments.

*Protest of Rodgers Bros. Custodial Servs., Inc., supra* (citations omitted). The CAB has applied the rule against "piecemeal" presentation of protest grounds rigorously. In *Rodgers Bros.*, for instance, the initial protest of an emergency waste disposal contract award charged that the contracting officer lacked a reasonable basis to find the protestor non-responsible for having violated the Solid Waste Facility Permit Act while disregarding a similar violation on the part of the successful bidder. The protestor later added an allegation that the dissimilar treatment demonstrated the contracting officer's bad faith. Although, arguably, the bad faith allegation "merely provide[d] additional support" for the earlier claim of unreasonable dissimilar treatment, the CAB *sua sponte* rejected the bad faith charge as "a new and independent ground of protest" that was "untimely raised." *See also Koba Assocs., supra.*

■■■■ The ten-day clock begins to run from the date on which "the basis of protest is known *or should have been known, whichever is earlier.*" D.C.Code § 2–309.08(b)(2) (emphasis added). "[A] protestor cannot sit idly by while awaiting information that provides the basis for its protest, but instead must diligently pursue the information within a reasonable time."

*Matter of Thomas May Constr. Co., supra,* at *3. "Where there is a public bid opening, . . . it is incumbent upon bidders to act promptly after bid opening to obtain information on the bids received, including copies of the bids themselves if necessary, so that upon receipt of notice of award the bidders will be aware of any alleged defect in the winning bid that would provide a basis for protest." *Id.*

### C. The Timeliness of Trifax's "Key Personnel" Protest

■■■ IIU's bid was available for inspection by the public, including Trifax, when the bids were opened on May 12, 2000. *See* D.C.Code § 2–303.03(d) (2001). It would have been apparent to Trifax from such an inspection that IIU's bid did not include the nurse identifications and resumes required by the IFB. Indeed, the contracting officer specifically noted the absence of the resumes on the Bid Abstract Form when he opened the bids. Thus, by August 15, 2000, when Trifax received formal notification of the contract award, it should have known the basis for its claim that IIU's bid was non-responsive. Trifax's failure to protest the contract award on that ground until October 20, 2000, would appear to be a clear violation of the ten-day ·filing requirement of D.C.Code § 2–309.08(b)(2).

The CAB and the Superior Court deemed the key personnel claim to have been timely-asserted on the rationales that it was "reasonably included within," or "provided additional support for," a protest ground that Trifax presented on August 30, 2000—its claim that IIU did not commit to pay required wages and benefits. If those rationales are valid, which we need not and do not decide,[8] the key

---

8. In our view, it is implausible to read Trifax's claim that IIU was "irresponsible" because it would not pay minimum wages and benefits, see footnote 1, *supra,* as actually stating a

claim that IIU's bid was not responsive because it omitted nurse identification information called for by the IFB. The two protest grounds are distinctly different, and Trifax

personnel claim would be treated as having been presented on August 30 rather than October 20. But the key personnel claim would not have been timely even if it had been presented on August 30, 2000. Because Trifax should have known the factual basis for the claim on August 15, its window of opportunity for asserting it in a bid protest closed ten business days later, on August 29, 2000.

It is immaterial that the CAB found the minimum wage claim to have been timely-asserted on August 30. The CAB's reasoning, that Trifax had no opportunity to ascertain the facts needed to frame that claim until August 22, does not apply to the key personnel claim, for Trifax had access to all the facts necessary to assert the latter claim by August 15. Having expired on August 29, the key personnel claim could not be resurrected by the subsequent filing of another claim, even if the two claims were factually interrelated. Even if it was proper for the CAB to consider the facts underpinning the key personnel claim to the extent they provided additional support for the minimum wage claim, that does not mean it was proper for the CAB to consider the key personnel claim as an independent ground of protest after it rejected the minimum wage claim. At that point, the rationale for considering the otherwise untimely key personnel claim evaporated.[9]

██ In the Superior Court, Trifax advanced a different rationale for finding that its October 20 assertion of the key personnel claim was timely. See footnote 5, *supra*. Trifax argued that the claim was timely because it had no standing to protest the award to IIU until October 5, 2000, when the District finally acknowledged the facts confirming its status as an aggrieved party. Taking into account the Columbus Day holiday, October 20 was the tenth business day following October 5. As this argument was neither presented to nor relied on by the CAB, exceptional circumstances must exist in order for this court to consider it. See, e.g., *Sawyer Prop. Mgt. of Md., Inc. v. District of Columbia Rental Hous. Comm'n*, 877 A.2d 96, 105–06 (D.C.2005); *Bio–Medical Applications of the District of Columbia v. District of Columbia Bd. of Appeals & Review*, 829 A.2d 208, 217 (D.C.2003); *Walsh v. District of Columbia Bd. of Appeals & Review*, 826 A.2d 375, 380 (D.C.2003); *Jewell v. District of Columbia Police & Firefighters Ret. & Rel. Bd.*, 738 A.2d 1228, 1231 (D.C.1999). No exceptional circumstances are present here, for Trifax's standing argument is fallacious.

The protest statute allows protests by "aggrieved" bidders, offerors or contractors. D.C.Code § 2–309.08(a). The Rules of the CAB define an "aggrieved person" to mean "an actual or prospective bidder or offeror (i) whose direct economic interest would be affected by the award of a contract or by the failure to award a contract, or (ii) who is aggrieved in connection with the solicitation of a contract." 45 D.C.Reg. 1384, 1385 (March 13, 1998), codified at 27 D.C.M.R. § 100.2(a) (2006). *See also Group Ins. Admin.*, 633 A.2d at 19 ("[A] disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, there was substantial chance that it would receive an award ....") (internal quotation marks, brackets and citations omitted).

When it moved to dismiss Trifax's protest, the District argued that Trifax was not aggrieved and lacked standing because another bidder, Motir, was next in line

admitted that it was unaware of the latter ground until a month after it presented the wages and benefits claim.

9. Thus, we need not and do not decide whether the minimum wage claim was timely.

after IIU for the contract award. The CAB has held that a bid protestor is not an aggrieved person, and therefore lacks standing to protest a contract award, where it would not be in line for the award even if its protest were upheld. *See, e.g., Protests Of Commando K–9 Detectives, Inc., and Executive Sec. & Eng'g Tech., Inc.* CAB Nos. P–405 & P–406, 42 D.C.Reg. 4597, 4598 (May 6, 1994). As Trifax pointed out, the District failed to concede that Motir's bid was not responsive (and hence that Motir was not next in line) until October 5.

Nonetheless, the District's challenge to Trifax's standing was erroneous. Trifax became an aggrieved party when the contract was awarded to its competitor. Moreover, the District's challenge did not mislead Trifax into failing to present its key personnel claim on time. Trifax correctly understood that it was an aggrieved party as of August 15, 2000, when it received formal notice of the award.[10] Trifax acted on that understanding by filing its bid protest fifteen days later. Thus, Trifax's failure to present its key personnel claim by the August 29 deadline was not due to the District's challenge to its standing (nor could it have been, as the District did not dispute Trifax's standing until September 20). The District's standing challenge therefore did not excuse Trifax's delay or justify extending the filing deadline.

### III.

For the foregoing reasons, we hold that Trifax's key personnel objection to the responsiveness of IIU's bid was untimely, and the CAB exceeded its jurisdiction by considering it. Because the key personnel objection was the sole ground on which the

CAB sustained Trifax's protest, that decision and the Superior Court's decision affirming it must be reversed.

*So ordered.*

---

10. Although the contracting officer ranked Motir ahead of Trifax, the critical deficiencies in Motir's bid were revealed (and noted in the Bid Abstract Form) in May 2000, when the bids were opened and made available for public inspection. See footnote 3, *supra*. Trifax therefore was on notice from the outset that Motir's bid was defective and that it was aggrieved by the award to IIU.